IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JO'ES OKOTOGHAIDE, | ) |
| Plaintiff, | ) JURY TRIAL DEMANDED |
| v. | ) |
| VEIN CLINICS OF AMERICA, INC., | ) |
| Defendant. | ) |

## COMPLAINT

Defendant Vein Clinics America, Inc. fired plaintiff Jo'Es Okotoghaide, leaving him without a job or health care. If all circumstances were the same except that Mr. Okotoghaide was not black Vein Clinics would not have fired him. Vein Clinics' decision to fire Mr. Okotoghaide was also influenced by the fact that he raised concerns of race discrimination in the weeks preceding his firing. This lawsuit seeks to hold Vein Clinics accountable for its violations of the state and federal anti-discrimination statutes.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States.

2. Venue in this district is proper under 28 U.S.C. § 1391(b) and (c) because the unlawful employment practices occurred in this district.

## PARTIES

3. Plaintiff Jo'es Okotoghaide is a citizen of the United States and was a citizen of the State of Illinois during all relevant time periods. He worked for defendant

Vein Clinics at its Downers Grove, Illinois location from September 2013 to February 2014. He is a black male.

4. Defendant Vein Clinics America, Inc. is a medical group specializing in phlebology (vein disease) with multiple locations in the United States and headquartered in Downers Grove, Illinois. Vein Clinics is an "employer" for the purposes of Title VII and Section 1981.

## FACTS

5. In August 2013, Mr. Okotoghaide was living in Oklahoma finishing up his graduate degree in English Literature. Vein Clinics offered him a job as an Accounts Recovery Specialist III in its Downers Grove, Illinois office.

6. Although just an entry level position in patient collections, Mr. Okotoghaide was excited about this new opportunity and immediately uprooted his life to move to Illinois.

7. Starting with Vein Clinics in September 2013, Mr. Okotoghaide brought with him significant experience and accomplishments. He previously had worked as a microbiologist, had four years lab experience working at the University of Oklahoma's Children's Hospital and held a double minor in Chemistry and Biology.

8. Mr. Okotoghaide did all he could to apply his work ethic and dedication to his new position.

9. Vein Clinics initially assigned Mr. Okotoghaide to work in its patient collections department, which was supervised by a white female named Karyn Rodriguez.

10. Ms. Rodriguez did not treat Mr. Okotoghaide in the same manner she treated the white employees she supervised. Despite his credentials and best efforts, Ms. Rodriguez treated Mr. Okotoghaide as if he was not capable of the job and chose to impose different terms and conditions on his employment. For example, she would get unreasonably impatient when he took longer to complete tasks than she thought was appropriate even though he, as a new employee, was still was in the process of learning.

11. The impatient and dismissive attitude Ms. Rodriguez exhibited toward Mr. Okotoghaide did not extend to the white employees who were his peers.

12. In fact, Vein Clinics had received complaints from non-white employees about Ms. Rodriguez prior to Mr. Okotoghaide being hired.

13. Ms. Rodriguez complained to her supervisor, Lorena Thomas, about Mr. Okotoghaide.

14. However, Ms. Thomas' interpretation of the situation was that Ms. Rodriguez was not giving Mr. Okotoghaide a fair chance to learn the job.

15. Ms. Thomas noticed that Ms. Rodriguez did not treat employees of color the same way she treated the white women she supervised.

16. Ms. Thomas counseled Ms. Rodriguez to treat all employees fairly and equally.

17. Ms. Thomas also transferred Mr. Okotoghaide to the Electronic Data Interchange ("EDI") department where Mr. Okotoghaide would report directly to her.

18. At EDI, Mr. Okotoghaide was trained to be the EDI back-up for an employee named Ariana, who was preparing to go out on maternity leave.

19. Lorena Thomas notified Vein Clinics that she believed Karyn Rodriguez was mistreating Mr. Okotoghaide.

20. Vein Clinics chose to fire Ms. Thomas shortly after she reported Ms. Rodriguez' disparate treatment of Mr. Okotoghaide.

21. Vein Clinics took no action to address Ms. Rodriguez' alleged misconduct against Mr. Okotoghaide, which had been brought to the company's attention by Ms. Thomas.

22. Vein Clinics also took no action to protect Mr. Okotoghaide from continued mistreatment by Ms. Rodriguez.

23. In fact, after firing Lorena Thomas, Vein Clinics chose to place Ms. Rodriguez in charge of the EDI department and have Mr. Okotoghaide report directly to her.

24. When Mr. Okotoghaide returned to work under Ms. Rodriguez, her mistreatment of him did not just continue, it worsened.

25. In January 2014, Vein Clinics assigned Mr. Okotoghaide to assist its Eligibility Department on a temporary basis as he already had completed his training on Ariana's EDI responsibilities and she had not yet gone on maternity leave.

26. Despite his still being in the EDI department, Ms. Rodriguez inexplicably began excluding Mr. Okotoghaide from EDI department meetings.

27. It was during this time Ms. Rodriguez also announced that Vein Clinics was removing Mr. Okotoghaide as the EDI back-up person for Ariana and placing Michelle Prosek, a white female, in that position.

28. Mr. Okotoghaide became increasingly alarmed that Ms. Rodriguez was trying to remove him from her department and possibly from Vein Clinics altogether. This was very troubling to him as he enjoyed his work at Vein Clinics. Indeed, he had uprooted his life, moving from Oklahoma to Illinois to take the job in the belief that he would have the opportunity to have a long and fruitful career at Vein Clinics.

29. Further, there was no reason for Ms. Rodriguez to be replacing Mr. Okotoghaide. No one at Vein Clinics had ever spoken to him about the quality of his EDI work. In fact, he had become so proficient in his back-up EDI role that he had been lent out to another department (Eligibility) that was short-handed. He also had earned the praise of other Vein Clinics employees for his quick learning and helpful assistance.

30. On January 28, 2014, Mr. Okotoghaide notified Vein Clinics' human resources department, specifically Bud Feigenbaum, that he believed Ms. Rodriguez' was targeting him as a black man.

31. Mr. Okotoghaide also notified Mr. Feigenbaum that he believed Ms. Rodriguez was trying to replace him in the EDI department with a white female.

32. By complaining to Vein Clinics' human resources department, Mr. Okotoghaide engaged in "protected activity" within the meaning of Title VII and Section 1981.

33. The next day, on January 29, 2014, Mr. Okotoghaide was informed of a rumor that he was going to be offered an ultimatum: transfer to the Eligibility department – out of Ms. Rodriguez' department – or be fired.

34. Later that morning, Eligibility supervisor Deepak Kootanal offered Mr.

5

Okotoghaide a permanent position in the Eligibility department. Mr. Kootanal assured Mr. Okotoghaide that although there was no official opening for the position, he (Mr. Kootanal) was confident he could get it approved by Vein Clinics' Vice President Ron Amrich if Mr. Okotoghaide agreed to the transfer.

35. Mr. Okotoghaide politely declined, explaining that he enjoyed his EDI work and wanted to stay in the EDI department. Mr. Okotoghaide explained that he was more than happy to continue helping the Eligibility department in addition to completing his EDI work.

36. During this meeting, Mr. Okotoghaide also told Mr. Kootanal that he (Mr. Okotoghaide) believed that Ms. Rodriguez was discriminating against him due to his race.

37. Mr. Kootanal stated he did not know anything about it and would look into it.

38. Later that same day, Mr. Kootanal called Mr. Okotoghaide into a meeting with him and Ms. Rodriguez. During this meeting Mr. Okotoghaide repeated his concern that he believed he was being discriminated against due to his race.

39. In response, Ms. Rodriguez assured Mr. Okotoghaide he was not being moved from the EDI department or replaced in his EDI back-up role and that he would return to the EDI department when Ariana left on maternity leave if not sooner.

40. Less than two weeks later, on February 11, 2014, Mr. Kootanal and Ms. Rodriguez held a series of meetings about the EDI department. The topic of these meetings was who was going to replace Ariana during her maternity leave. Both Ariana

6

and Ms. Prosek (the white female who Ms. Rodriguez had previously announced was the new backup for EDI) were invited to these meetings. Mr. Okotoghaide was not invited to these meetings.

41. Two weeks later, on February 24, 2014, Mr. Okotoghaide was summoned to a meeting with Mr. Kootanal and the EDI department lead, Kim Kavala. Mr. Okotoghaide found it odd that Mr. Kootanal (who did not supervise the EDI department) rather than Ms. Rodriguez (who did) was leading a meeting about the EDI department.

42. Mr. Kootanal informed Mr. Okotoghaide that Vein Clinics had chosen to fire him effective February 28, 2014.

43. Mr. Kootanal stated that Vein Clinics had no work for Mr. Okotoghaide in either the EDI or Eligibility departments.

44. Vein Clinics' retaliatory conduct followed just a few weeks after Mr. Okotoghaide complained about discrimination.

45. Vein Clinics' alleged reason for needing to terminate Mr. Okotoghaide's employment for a lack of work does not make sense.

46. First, Ariana was still slated to take (and did eventually take) maternity leave so there was still a need for someone to take on her EDI role at the time Vein Clinics fired him. Mr. Okotoghaide was trained to be Ariana's backup for this role.

47. Second, Mr. Kootanal had assured Mr. Okotoghaide just a few weeks earlier that if he agreed to transfer out of EDI and into Eligibility, Mr. Kootanal could obtain approval for creating a new position. Indeed, Mr. Okotoghaide was already

doing work in the Eligibility department and so, after he was fired, someone else would have to do that work.

48. In contrast, Vein Clinics chose not to terminate the employment of Michelle Prosek (white female).

49. Vein Clinics started training Ms. Prosek for Mr. Okotoghaide's position as back-up for EDI after Mr. Okotoghaide was terminated.

50. When Vein Clinics fired Mr. Okotoghaide, it left him without a job or health insurance in a city and state he had relocated to less than a year prior and with just four days' notice.

51. If Mr. Okotoghaide had not been a black or raised concerns about being discriminated against, Vein Clinics would not have fired him.

## COUNT I – DISCRIMINATION IN VIOLATION OF TITLE VII

52. Plaintiff incorporates by reference the above paragraphs.

53. Plaintiff has exhausted his administrative remedies.

54. As described above, plaintiff was discriminated against due to his race.

55. As described above, Vein Clinics subjected him to different terms and conditions of employment and fired him.

56. Plaintiff suffered losses, both economic and otherwise, as a result of defendant's discrimination.

## COUNT II – RACE DISCRIMINATION IN VIOLATION SECTION 1981

57. Plaintiff incorporates by reference the above paragraphs.

58. Section 1981 of the Civil Rights Act of 1866, as amended, prohibits employers from subjecting their employees to discrimination with respect to terms, conditions, benefits or privileges of employment based on race or ethnicity.

59. Section 1981 also grants all persons within the jurisdiction of the United States the same rights to make and enforce contracts and to the full and equal benefits of the law as is enjoyed by white citizens.

60. Defendant denied plaintiff equal terms and conditions, benefits or privileges of employment, and fired him because of his race.

61. Defendant's actions were willful, intentional and/or done maliciously or with callous disregard or reckless indifference to federally protected rights. Exemplary damages are warranted to prevent similar unlawful conduct by defendant.

62. Plaintiff was damaged by defendant's conduct.

## COUNT III – RETALIATION IN VIOLATION OF TITLE VII

63. Plaintiff incorporates by reference the above paragraphs.

64. As described above Vein Clinics retaliated against plaintiff for complaining about discrimination.

65. Plaintiff suffered losses, both economical and otherwise, as a result of defendant's retaliation.

## COUNT IV– RETALIATION IN VIOLATION OF SECTION 1981

66. Plaintiff incorporates by reference the above paragraphs.

67. As described above, Vein Clinics retaliated against plaintiff for complaining about discrimination.

68. Plaintiff suffered losses, both economic and otherwise, as a result of defendant's retaliation.

## JURY DEMAND

69. Plaintiff hereby demands a trial by jury.

70. WHEREFORE, plaintiff respectfully requests the following relief:

   a. Vein Clinics be adjudicated and declared to have violated the aforementioned statutes and laws;

   b. plaintiff to be awarded appropriate damages to compensate him for any and all lost wages and other benefits and/or any other appropriate relief for which he is entitled by virtue of Vein Clinics' violation of the aforementioned statutes and laws;

   c. plaintiff to be awarded backpay and lost future earning to compensate him for his loss;

   d. plaintiff to be awarded compensatory damages in an appropriate amount as allowed by law;

   e. plaintiff to be awarded punitive damages in an appropriate amount and as allowed by law;

   f. plaintiff to be awarded liquidated damages in an appropriate amount and as allowed by law;

   g. plaintiff to be awarded pre-judgment interest on the above damages;

   h. plaintiff to be awarded an amount to compensate him for the tax consequences of a lump sum award of damages;

    i. plaintiff to be awarded his costs and reasonable attorney's fees, including expert witness fees; and

    j. such other relief as is just and proper.

                                                 Respectfully submitted,

                                                 JO'ES OKOTOGHAIDE

                                               /s/Johanna J. Raimond
                                               By His Attorney

Johanna J. Raimond
Law Offices of Johanna J. Raimond Ltd.
431 S. Dearborn, Ste. 1002
Chicago, Illinois 60605
Telephone: (312) 235-6959
Fax: (312) 469-8302
jraimond@raimondlaw.com